**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **COLUMBIA CASUALTY COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 05-CV-898** |
| | : | |
| **v.** | : | |
| | : | **JUDGE MARBLEY** |
| **CITY OF ST. CLAIRSVILLE, OHIO,** | : | **Magistrate Judge King** |
| *et al.,* | : | |
| | : | |
| **Defendants.** | | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on the Parties' Cross-Motions for Summary Judgment. Both Plaintiff, Columbia Casualty Corporation (hereinafter "Plaintiff" or "CCC") and Defendants, Al Davies, Robert Vincenzo, Patricia Bruhn, Frank Sabatino, John Barkmir, Tim Porter, John Swan, Linda Burch, Jim Weisgerber, Thomas Murphy, Dennis Bigler, Richard Bauer, Shelly Fortney, Don Smithburger, Jill A. Ludici, and the City of St. Clairsville, Ohio, (hereinafter "the City" or "Defendants") have moved this Court for declaratory relief relating to whether, under an insurance policy issued by CCC to Defendants, CCC is obligated to defend or indemnify Defendants in a suit brought against Defendants by a third-party.  For the reasons stated herein, Plaintiff's Motion for Summary Judgment is **GRANTED in part**, **DENIED in part, and rendered Moot in part,** and Defendants' Motion for Summary Judgment is **GRANTED in part, DENIED in part, and rendered Moot in part**.

**II. FACTS**

Plaintiff and Defendants entered into an insurance contract, CCC Public Officials Liability Policy number POL2237778143 ("the CCC policy" or "the policy"), which insured Defendants against certain occurrences during the period dating from May 20, 2004 until May 20, 2005. More specifically, the policy states that CCC is obligated to pay the defense costs and to indemnify Defendants if they are sued for certain "wrongful acts" as defined in the policy.[1]

On December 13, 2004, a third-party to this action, Samuel Harris ("Harris"), filed a lawsuit against Defendants in the United States District Court for the Southern District of Ohio, Eastern Division, S.D. Ohio case number 2:04cv1179 (Frost, J.) (Hereinafter "the Harris lawsuit"). The Parties do not dispute that the allegations in the Harris lawsuit, if true, occurred during the period in which Defendants were covered by the CCC policy. Rather, CCC asserts that it is not under an obligation to defend or indemnify Defendants in the Harris lawsuit because the claims in Harris' third amended complaint (the "Harris complaint") allege conduct that falls within exceptions to the policy's coverage. Before examining this assertion, the Court will review the claims that Harris asserts in his complaint.

---

[1] The policy defines a wrongful act as "any actual or alleged error or misstatement or act or omission or neglect or breach of duty, including misfeasance and nonfeasance, by the individual insured in the discharge of their duties with the 'public entity,' individually or collectively, or in any matter to which this insurance applies claimed against them solely by reason of their being of having been duly elected or appointed officials. 'Wrongful act' includes allegations of malfeasance, but only if they are ultimately proven to be groundless. This insurance does not apply to malfeasance if there is a final legal determination that such has taken place."

2

## A. Harris' Allegations and Claims for Relief

In 2001, Harris was the owner of two tracts of land located in St. Clairsville, Ohio.  On one piece of property he operated the Terrace Mobile Home Park (the "Terrace Property").  On the other piece of property, located near an interstate, he rented portions of land to commercial tenants (the "Interstate Property").  Harris alleges that Defendant Vincenzo, the Mayor of St. Clairsville, requested that Harris donate the Interstate Property to the City so that the City could build a "Welcome Center" on it.  Harris declined to sell the property at less than full value.

Harris alleges that Mayor Vincenzo and other City officials engaged in a pattern of harassment against him in order to encourage him to sell the Interstate Property to the City at a price vastly under-market.  This harassment allegedly included inflating the water and electricity bills for the Terrace Property by over $100,000.  In connection with these utility bills, the City purportedly filed over $25,000 in fraudulent liens on the Terrace Property.  Additionally, Harris contends that the City refused to make repairs to the telephone poles surrounding the Terrace Property, causing them to fall down and damage a mobile home.  Harris alleges that Defendants' harassment caused him to lose money on his contracts with his Terrace tenants and eventually to sell the property at less than full market value.

In addition, Harris claims that City officials forged his signature on a petition for annexation of the Interstate Property.  Later, City officials allegedly told him that the City had in fact annexed the property.  When Harris challenged the annexation, he claims that City officials refused to take any action.

Last, Harris contends that the City changed the zoning on the Interstate Property from "commercial" use to "office and institutional" use.  This allegedly caused Harris' tenant to

vacate, a loss of $190,000 in construction work on the property, and the termination of a contract that Harris had to sell the property.

Harris' complaint contains seven different claims.  In Count I of the complaint, Harris states a tortious interference with contract claim.  Specifically, Harris asserts that the City over-billed his utilities relating to the Terrace Property, placed fraudulent liens on the Terrace Property, and refused to make the requisite repairs on certain telephone poles, causing Harris to sell the property at a loss of approximately $220,000.  Harris claims that this conduct constitutes tortious interference with contract or prospective business advantage.  Additionally, in Count I, Harris asserts that the City, by annexing and changing the zoning of the Interstate Property, tortiously interfered with the lease Harris had with a commercial tenant of the Interstate Property.  Harris seeks compensation for emotional distress, loss of contract revenue, and punitive damages.

In Count II of the complaint, Harris claims that the City annexed the Interstate Property in violation of "Ohio code requirements."  He seeks damages for the resulting loss of revenue relating to a commercial lease he had on the property, a court ordered de-annexing of the property, compensation for the lost value of the Interstate Property, and punitive damages.

In Count III of the complaint, Harris asserts that the City took the Interstate Property in violation of the Fifth Amendment of the United States Constitution by illegally annexing and zoning the property.  Harris also asserts that Defendants "took the Terrace Property by illegally and maliciously making it impossible for Harris to continue to operate" the mobile home park. Harris seeks damage for the reduction in value of his properties.

4

In Count IV of the complaint, Harris asserts that the same conduct described in Count III constitutes a "taking without due process" in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

In Count V, Harris makes a civil conspiracy claim.  Specifically, he asserts that City officials deprived him of funds and property by falsely inflating his water bills, forging his signature on annexation documents, and placing fraudulent liens on the Terrace Property.

In Count VI, Harris claims that City officials violation 42 U.S.C. §1983 by using their positions to deprive him of property, interfere with his business, and violate his due process and equal protection rights.

In Count VII, Harris states a negligence claim against Defendant Lucidi.  He asserts that Lucidi, as Finance Director of the City, negligently supervised the financial dealings of the City to Harris' detriment.[2]

In addition to damage requests for loss of value in both properties, loss of value in his contract, punitive damages, and damages for emotional distress, Harris makes several other references to the type of damages he is seeking in his complaint.  In Counts I, VI, and VII, he concludes by saying, approximately, "In consequence of defendants' acts . . . [Harris] was damaged as aforesaid and is entitled to compensation in an amount which is yet undetermined, but which, upon information and belief, exceeds the sum of $1,000,000."

---

[2]Harris has dismissed this count.  See commentary below.

## B.  Summary of the Arguments

CCC alleges that each of the six claims in the Harris lawsuit are excluded from Defendants' coverage by certain provisions of the policy.[3]

The CCC policy specifically excludes from its coverage defense or indemnification funds relating to any claims for "bodily injury" or "property damage."  Also excluded from converge is any claim "arising out of inverse condemnation, adverse possession . . . or eminent domain," or a claim seeking "injunctive, mandamus, declaratory or equitable relief."

The CCC policy defines "bodily injury" as "bodily injury, sickness, disease, emotional distress, or mental anguish . . .".  The policy defines "property damage" as physical injury to tangible property or "loss of use, or reduction in value, of tangible property that is not physically injured or criminally abstracted."

Defendants argue that the alleged acts in Harris' claims do not fall in any of these exceptions, and, as such, they constitute "wrongful acts" which are covered under the policy.

## C.  Procedural Posture

Harris filed a lawsuit against Defendants on December 13, 2004.  After paying all the premiums and receiving notice of the lawsuit, the City filed a claim with CCC under the policy asserting that CCC was obligated to defend and to indemnify the City in the Harris case.  CCC initially disclaimed any obligation to defend or to indemnity the City.  Later, CCC agreed to provide the City with a complete defense under a full reservation of rights.

---

[3]Although CCC does not expressly state this, it essentially concedes that if the Harris claims do not fall within one of the few exemptions it mentions in its brief, then the conduct must constitute a "wrongful act," and thus is covered under the policy.

6

On April 18, 2006, CCC filed its First Amended Complaint.  This complaint asks this court to declare that CCC does not have to defend or to indemnify Defendants for each claim asserted against them in the Harris lawsuit.  Additionally, CCC requests that this Court order Defendants to reimburse CCC for legal expenses that CCC has already paid under reservation of rights in connection with the Harris lawsuit.

On April 28, 2006, Defendants filed a Counterclaim against CCC requesting this Court to interpret the CCC policy and declare that it provides coverage for each and every claim against Defendants in the Harris lawsuit.  Defendants ask this Court to hold that CCC is obligated to cover the defense costs of the Harris lawsuit, that CCC must indemnify Defendants against any damage award in the Harris case, and that CCC is not entitled to reimbursement for costs already expended on behalf of Defendants in connection with the Harris lawsuit.

The Parties filed Cross-Motions for Summary Judgment requesting that this Court decide:
1) on which, if any, of the six claims in the Harris lawsuit the CCC policy requires CCC to defend or indemnify Defendants; and 2) whether CCC is entitled to reimbursement for defense costs supplied to Defendants under the aforementioned reservation of rights agreement.  Each Party has filed a response and a reply and, as such, the Parties' Cross-Motions are now ripe for adjudication.

Additionally, Judge Frost granted summary judgment in two separate decisions on December 21, 2006 in favor of Defendants in the Harris lawsuit, thus completely dismissing Harris' claims (S.D. Ohio case number 2:04cv1179).

### III. STANDARD OF REVIEW

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits. . .". *Id.* (citations omitted).

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating motions for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In the case of cross-motions, the Court must "tak[e] care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248. The movant has the burden of establishing that there are no genuine issues of material fact, which

may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388-89 (6th Cir. 1993). Significantly, in responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).

The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339-40 (6th Cir. 1993). Furthermore, the mere existence of a scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).

## IV. LAW AND ANALYSIS

CCC asserts that Counts III and IV of the Harris complaint state claims for "inverse condemnation," and, as such, are exempt from the policy's coverage. Furthermore, CCC contends that Counts I, II, V, and VI all "arise from" these inverse condemnation claims and, therefore, are also exempt from coverage.[4] Defendants assert that none of the claims constitute

---

[4]At oral argument, Counsel for Defendants stated that she omitted an argument from her brief. Her argument was that Harris' first and second complaints stated claims based on negligence, fraud, and other actions that Defendants assert fall squarely within the coverage of the policy. Counsel argued that CCC should be responsible for reimbursing Defendant's costs related to the defense of those complaints. Counsel's argument is without merit. The motions for summary judgment in this case address on those claims made by Harris in his third amended complaint. As such, the Court will rule only with respect to the reimbursement/indemnification

inverse condemnation claims nor arise from inverse condemnation claims.  As such, they assert

that the conduct discussed in the Harris complaint falls squarely within the "wrongful acts"

covered by the CCC policy.  The Court will first decide which of the Harris claims CCC must

defend the City against, then the Court will decide the claims for which CCC must indemnify

Defendants.

   Before discussing the merits of the Parties' arguments, the Court will examine how Ohio

law construes insurance contracts.  An insurer's duty to defend attaches when the allegations in

the complaint state a claim that is "potentially or arguably" within the scope of the policy's

coverage regardless of the ultimate outcome of the case.  *City of Willoughby Hills v. Community*

*v. Cincinnati Ins. Co.,* 9 Ohio St.3d 177, 179 (1984).  An insurer must defend an insured if the

allegations in the complaint arguably state a claim within the policy's coverage, or there is some

doubt as to whether a theory of recovery within the policy's coverage has been plead, even

though the pleadings themselves do not explicitly bring the action within the policy's coverage.

*Id.* at 180.  This is because Ohio has adopted a notice pleading system, in which the pleadings

may not provide enough factual information to determine whether the insurer has an obligation

to defend the insured under the policy.  Accordingly, "the 'scope of the allegations' may

encompass matters well outside the four corners of the pleadings." *XXL,* 341 F.Supp.2d. 825,

841 (N.D. Ohio 2004) (citing *Willoughby*, 9 Ohio St.3d at 180).  If the pleadings bring a given

claim within the scope of the policy, the duty to defend will attach.  *Id.*  The insured must

demonstrate, however, that the allegations in the complaint arguably bring the claims within the

policy's coverage.  *XXL*, 341 F. Supp2d. at 841.  Lastly, "where provisions of a contract for

_____

costs as related to Harris' third complaint.

insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Insurance Co.*, 35 Ohio St.3d 208, 211 (1988).

## A. <u>Harris Counts III and IV</u>

CCC contends that the takings claims which Harris asserts under the Fifth and Fourteenth Amendments constitute "inverse condemnation" claims which are excluded from the policy's coverage. Defendants do not dispute that the policy excludes from coverage inverse condemnation claims, eminent domain claims, or any claims arising therefrom. Rather, they contend that none of the six remaining counts in the Harris complaint states an inverse condemnation claim.

"The phrase 'inverse condemnation' appears to be one that was coined simply as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *United States v. Clarke*, 445 U.S. 253, 257 (1980); *City of Cincinnati v. Chavez Properties,* 117 Ohio App.3d 269, 274*; Agins v. City of Tiburon*, 447 U.S. 255 (1980).[5] "As defined by one land use planning expert, '[i]nverse condemnation is 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *Clarke* 445 U.S. at 257. Regulatory takings can be the basis for an inverse

---

[5]A claim for <u>compensation</u>, not declaratory relief. Although, the CCC policy also excludes from coverage any action for declaratory or injunctive relief.

11

condemnation action.  *See First English Evangelical Lutheran Church of Glendale v. Los Angeles*, 482 U.S. 304, 304 (1987).

Inverse condemnation is a <u>state remedy</u> which must be exhausted before pursuing a federal takings claim.  *See, e.g.*, *Daniels v. Area Plan Com'n of Allen Count*, 306 F.3d 445, 456 (7th Cir. 2002) ("After utilizing a state remedy, such as a suit for inverse condemnation, if the owner does not receive what he believes is just compensation, he may proceed with a Takings Clause claim in federal court."); *Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson,* 473 U.S. 172, 173 (1987) ("Under Tennessee law, a property owner may bring an inverse condemnation action to obtain just compensation for an alleged taking of property under certain circumstances. Respondent has not shown that the inverse condemnation procedure is unavailable or inadequate, and until it has utilized that procedure, its taking claim is premature."); *City of Cincinnati v. Chavez Properties,* 117 Ohio App.3d 269, 274 (1st Dist. 1996).  Thus, when a person believes that his property has been taken without just compensation, he must first exhaust his state remedies before proceeding with a federal takings claim.  Bringing an inverse condemnation suit in state court is the remedy that most states employ.  Only once a claimant is denied just compensation for the alleged taking at the state level may he pursue a takings claim in federal court; if he fails to exhaust his state remedies, his claim is not ripe and should not be heard by the federal court.  *See Williamson,* 473 U.S. at 173, *Coles v. Granville*, 448 F.3d 853, 861 (6th Cir. 2006); *Daniels* 306 F.3d at 456.

Because claims III and IV of the Harris complaint state takings claims, which are federal claims, they cannot possibly be, in and of themselves, inverse condemnation claims.  Harris alleges conduct that could be used to state an inverse condemnation at the state level, but he does

12

not do so. Thus, given his obvious intent to pursue a federal takings claim, CCC's argument that

claims III and IV in the Harris complaint constitute inverse condemnation claims is without

merit.

Nonetheless, a takings claim asserted under the U.S. Constitution may "arise out of" an

inverse condemnation claim for the purposes of the CCC policy. Under Ohio law, the term

"arising out of" in a liability insurance policy can mean "flowing from," "having its origin in,"

"originating from," or "growing out of." *Stickovich v. Cleveland*, 143 Ohio App.3d 13, 37 (Ohio

App. 8th Dist. 2001). Only after a state court or agency rejects a plaintiff's inverse

condemnation claim may he pursue a takings claim in federal court. Thus, a takings claim

clearly has "its origins in" or "flows from" the required state compensation proceedings. It flows

from the adverse judgment of the state court. Had Harris properly brought his claim to state

court, and been denied compensation for the alleged taking, he would have been procedurally

correct to bring a takings claim in federal court.

One could argue that because Harris never brought a state court claim, the takings claims

in Counts III and IV could not have flowed from or arisen from an inverse condemnation claim.

Harris did not file a state law claim of any sort for compensation for the alleged taking of either

the Interstate or the Terrace Property. This, however, does not prevent this Court from finding

that a takings claim can only arise from the required state court proceeding. If Harris had filed

an inverse condemnation claim in state court, it would have fallen within the aforementioned

exemption in the CCC policy. If he then filed the takings claim in question, it would also be

exempt because it would have arisen from the state law inverse condemnation proceeding. This

Court finds no reason to punish CCC for Harris' procedural failing. Had Harris brought the

13

claims as the law dictated he should, CCC would not have had to defend the City against them; there is no reason that CCC should have to defend the City against the same claim brought in a procedurally incorrect manner.

Moreover, it is irrelevant whether Harris could have prevailed on his takings claims as pled. The CCC policy does not exempt only valid inverse condemnation claims. Rather, it exempts certain claims as plead. Adopting a standard that requires this Court to examine the underlying complaint to see whether the asserted claims have merit would defeat the purpose of a notice pleading system. Also, requiring the underlying claims to have potential to be meritorious would defeat the purpose of the contract's exemptions by greatly increasing the number of claims that fall within the policy's coverage – all frivolous claims.

Defendants raise three additional arguments, all without merit. Defendants argue that Ohio law does not contain a claim for inverse condemnation. They cite a litany of cases in support of this proposition. Defendants' assertion is correct, Ohio state law does not contain an "inverse condemnation" action per se. Under Ohio there is no "inverse condemnation or other direct, statutory cause of action for plaintiffs seeking just compensation for a taking." *Coles*, 448 F.3d 853, 861. Instead, Ohio law provides a statutory mechanism by which the government actor seeking to take property is under a duty to bring an appropriation proceeding against the landowner." *Id.* If the government fails to bring such a proceeding, the prospective plaintiff may bring a mandamus action in state court forcing the government to afford him a

compensation hearing.  *Id.*[6]  If the plaintiff is denied compensation at this hearing, he may then

bring a claim under the Just Compensation Clause in federal court.  *Id.*

Defendants argue that because an "inverse condemnation" claim does not exist under

Ohio law, none of the claims in the Harris complaint can constitute or arise from an inverse

condemnation claim.  The Court disagrees.  Looking at the CCC policy as a whole, the Parties'

intent is to exempt takings claims from coverage.  In the CCC policy, the Parties specifically

contract to exempt any claims for "inverse condemnation or eminent domain" from coverage.

Additionally, they choose to exempt claims relating to the reduction in value of real property

from coverage, which is often the measure of damages in a takings claim.  This illustrates that

the intent of the Parties is to preclude actions in which the government allegedly takes property

without adequate compensation.  Moreover, it would be illogical for the Parties to exclude a

particular type of claim from coverage if it was legally impossible for that claim to exist.

Moreover, inverse condemnation is simply a shorthand method of describing the state

proceeding at which a plaintiff must first request compensation before bringing a takings claim.

Inverse condemnation as a term has been used interchangeably with the term mandamus action

by several Ohio courts.  In *Chavez*, the court specifically noted that in Ohio, a landowner

petitioned for writ of mandamus in an inverse condemnation proceeding. 117 Ohio App.3d at

269; *see also State ex rel. Shemo v. Mayfield Hts.*, 95 Ohio St.3d 59, 62 (2002) (discussing writ

of mandamus and inverse condemnation in the same breath).  The *Chavez* court called Ohio's

---

[6] The *Coles* decision revolved around whether a mandamus action afforded a prospective
plaintiff a reasonable means of obtaining compensation at the state level before the plaintiff was
allowed to bring a takings action in federal court.  The court held that it did.

15

compensation hearing an "inverse condemnation"[7] proceeding even though that is not its technical name.

The most instructive case on this issue is *XXL of Ohio, Inc. v. City of Broadview Heights*, 341 F.Supp.2d 825 (N.D. Ohio 2004). In *XXL*, the court was asked to decide whether an insurance company was required to indemnify the city for amounts payed to settle a lawsuit revolving around a "sign ordinance." *Id.* at 829. This sign ordinance prohibited the plaintiff in the underlying case from utilizing certain advertisement signs for his motel. *Id.* He then brought a takings action under 42 U.S.C. §1983. *Id.*

Plaintiff was victorious in his suit against the city. The city then sought indemnification from its insurer. The insurer brought an action for declaratory relief, requesting the court to hold that the actions of the city fell within certain exemptions to the insurance policy in question. *Id.* at 828.

The insurance policy stated, in relevant part, that the policy does not cover:

> Any injury or damage arising out of or resulting from a taking that involves or is <u>in any way related to the principles of eminent domain, inverse condemnation,</u> adverse possession, right or prescription or dedication by adverse use or by whatever name used, whether "claim(s)" is made directly against any insured or by virtue of any agreement entered into by or on behalf of any insured. (emphasis added) *Id.* at 832.

This language is very similar to the language of the CCC policy. After discussing the interrelationship between inverse condemnation and eminent domain, the court in *XXL* held that "takings which violate § 1983 are exercises of eminent domain" and as such were exempt from the policy's coverage. *Id.* at 837. *See also First English Evangelical Lutheran Church of*

---

[7] Other names for inverse condemnation are "constructive taking" or "de facto taking."

*Glendale v. Los Angeles County, Cal.*, 482 U.S. 304, 305 (1987) (noting the interrelationship between inverse condemnation and eminent domain.)

Thus, whether Harris' takings claims are viewed as arising from an inverse condemnation or arising from eminent domain, they are exempt from the coverage of the CCC policy.

Second, Defendants argue that because Harris did not pursue his state law remedies, his takings claims are not ripe, and as a result, this Court does not have jurisdiction to decide them. This is correct. As Judge Frost held in the his summary judgment opinion in the Harris lawsuit, Harris' takings claims are not ripe. This Court, however, is not deciding Harris' claims. The only issue before this Court is whether the CCC policy requires CCC to defend the City in the Harris lawsuit. Whether Harris claims are ripe is irrelevant to this case. As such, this argument is without merit.

Third, Defendants argue that Counts III and IV are really not takings claims. Rather, Defendants argue that the underlying acts of these claims are annexation and zoning which constitute "wrongful acts" covered under the policy. This argument is also without merit. The acts of "annexation" and "zoning" underlie several claims in the Harris lawsuit. These actions are the basis for several different claims, including a takings claim. Just because the actions themselves may constitute separate claims does not negate the fact that Harris can also use them to support a takings claim.

To support their contention that the CCC policy covers Counts III and IV of the Harris complaint, Defendants rely on *C.V. Perry & Co. v. Village of West Jefferson*, 110 Ohio App.3d 23 (12th Dist. 1996). Defendants assert that *Perry* stands for the proposition that a regulatory

action by a city resulting in a taking does not arise out of an inverse condemnation claim.  This expansive view of *Perry* is not correct.

In *Perry*, the parties asked the court to decide whether the village's liability insurer was required to defend it against a complaint that arguably or potentially fell within policy coverage arising from the mayor's stop order on building permits.  *Id.* at 27.  The court held, among other things, that "a cause of action in inverse condemnation [cannot be] stated for denial of a building permit."  *Id.* at 28.  This case is inapplicable for two reasons.  First, the case does not include the policy language in question so there is no way for this Court to determine whether that policy language in *Perry* is similar to the CCC policy's language.  Second, Perry involves the denial of building permits whereas this case involves annexation and zoning.  Several decisions have established that a plaintiff may recover on a takings claim based on zoning.  *See, e.g., Shemo*, 95 Ohio St.3d at 62; *Jaylin Investments, Inc. v. Moreland Hills*, 107 Ohio St.3d 339, 341 (2006).

In summary, this Court holds that claims III and IV arise either from an inverse condemnation claim or an eminent domain claim, and as such, they are clearly outside even the widest arguable scope of the policy's coverage.  As a result, the Court **GRANTS** summary judgment in favor of CCC and declares that CCC need not defend the City against claims III and IV of the Harris complaint.  Next, the Court will examine whether Harris' other claims "arise from" the takings claims stated in Counts III and IV of his complaint.

### B. Harris' Other Claims

CCC asserts that the other four remaining claims "arise from" the purported inverse condemnation claims in Counts III and IV, or inverse condemnation itself.  While the other four claims may be based on the same underlying actions or conduct as Counts III and IV – namely

18

the allegedly illicit zoning and annexation of the Interstate Property and the fraudulent water bills relating to the Terrace Property – they do not necessarily arise from the same *claim*. Each claim must be analyzed individually to see if it arose from the same claims or underlying theory of inverse condemnation evinced in Counts III and IV. Simply because these claims are based on the same conduct as the takings claims does not necessitate that they arose from the takings claims. Moreover, it is theoretically possibly for Harris to fail on his takings claims, yet succeed on other claims.

## 1. **Count VI**

In Count VI, Harris alleges a violation of 42 U.S.C §1983. CCC states that this claim is the same as the takings claim asserted in Count IV, but brought through §1983. It is instructive to examine how Judge Frost dealt with this issue in his summary judgment opinion in the underlying case. In *Harris v. City of St. Clairsville, OH*, 2006 WL 3791404 at *17 (S.D. Ohio 2006), Judge Frost states:

> Because of the incoherent manner in which [Harris/Plaintiff] presents his allegations in the Third Amended Complaint, this Court must address Count Four in light of Count Six. In Count Four, Plaintiff essentially repeats his allegations from Count Two and Three, and then argues that Defendants' annexation, zoning, and refusal to de-annex his Interstate Property constituted a taking of his property in violation of Plaintiff's due process rights. In Count Six, Plaintiff alleges that Defendants essentially deprived Plaintiff of his due process and equal protection rights in violation of 42 U.S.C. § 1983. Plaintiff mistakenly grants under Count Six a separate cause of action based on 42 U.S.C. § 1983 as if it in itself creates a right to sue.

The court then notes that 42 U.S.C. § 1983, if applicable at all, would be the proper vehicle for the claim in Count IV. *Id.* Thus, the court in *Harris* found that Claim VI and Claim IV are functionally equivalent. This Court agrees. Hence, CCC is not required to defend the City against Count VI because it falls within the CCC policy's inverse condemnation exception.

19

**2. <u>Count I</u>**

In Count I, Harris states two separate tortious interference claims.  First, he claims that the City's over-billing interfered with his contracts with existing tenants of the Terrace motor home complex.  Second, he argues that the City's zoning interfered with a lease regarding the Interstate Property.  CCC, relying on *Nutmeg Ins. Co. v. Clear Lake City Water Authority*, 229 F.Supp.2d 668 (S.D. Texas 2002), argues that these tortious interference claims arise from the takings claims asserted in Counts III and IV.  In *Nutmeg*, the court found that a contracts claim and a quantum meruit claim arose out of a underlying-plaintiff's inverse condemnation claim and as such, plaintiff insurance company did not have to indemnify defendants.  ("Claimants' breach of contract and quantum meruit claims do logically arise out of the unconstitutional takings claim, <u>if a taking is found to have occurred</u>. (emphasis added) ("no breach of contract would have occurred and no attorneys' fees would have been recoverable if Clear Lake had not "taken" Claimants' property without just compensation.")  *Id.* at 696 and 685.

The court's decision in *Nutmeg* is predicated on the fact that liability in the underlying case had already been established; another court already decided that the defendants were liable for takings without just compensation.  In this case, the opposite is true.  In the underlying case, the court dismissed Harris' takings claims.  Moreover, the tortious interference claims can stand on their own absent any takings claims.  For example, Harris alleges that the City inflated his water bills thus interfering with a contract.  Harris need not show that a taking has occurred in order to prevail in this claim.  Harris also claims that the city's zoning interfered with an existing lease on the Interstate Property.  This zoning need not constitute a taking for Harris to allege that

it interfered with a contract.  As such, CCC's argument that Count I falls within the policy's
inverse condemnation exclusion is without merit.

### 3.  Count II

In Count II, Harris alleges that the City illegally annexed his land in violation of the Ohio
Code.  CCC alleges that this claim arises out of inverse condemnation.  In support of its position,
CCC notes that the requested relief for this claim is de-annexation of the land or compensation
for its loss in value, the same relief usually requested in a takings claim.  Defendants assert that
"wrongful annexation" is a claim separate from a takings claim.  They contend that the alleged
annexation was performed through "wrongful acts" covered by the policy and not through any
sort of takings procedure.

Harris asserts his annexation claim under Ohio's annexation laws.  *See Harris*, 2006 WL
3791404 at *7.  He alleges that the procedure Defendants used to annex his land violated his
procedural and substantive rights under these laws.  *Id.*  Thus, while the allegedly illicit
annexation also underlies Harris' takings claims, in Count II it has a completely separate legal
basis.  The occurrence of taking is not an element of Harris' unlawful annexation claim.  As
such, the annexation claim could survive even if Harris did not state a formal takings claim in his
complaint.  For example, theoretically, the court could find that the annexation did not constitute
a taking but did violate Harris' substantive or procedural rights under the Ohio annexation
statute.  Thus, the annexation claim is separate from the takings claims.  Accordingly, CCC's
argument that Count II falls within the policy's inverse condemnation exclusion is without merit.

### 4. __Count V__

In Count V, Harris makes a civil conspiracy claim. Under Ohio law, a civil conspiracy is "a malicious combination of two or more persons to injure another person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995) (citations omitted). Harris' complaint states that the Defendants conspired to "deprive [him] of his funds and property." CCC alleges that because the legal object of the alleged conspiracy was the taking of Harris' property, this claim arises out of inverse condemnation. The Court disagrees. First, the legal object of this alleged conspiracy is not evident from the pleadings. Second, in order to prevail on a civil conspiracy claim, a plaintiff must establish the existence of an underlying unlawful act or tort. *See Gosden v. Lewis*, 116 Ohio App.3d 195, 219 (9th Dist. 1996). Thus, there are elements aside from the elements present in a takings claim that Harris must prove in order to prevail. Moreover, he need not show the existence of a taking in order to prevail; all he must show is "actual damages" which could range from physical injury to injury to contractual relations. The civil conspiracy claim, therefore, is separate from the takings claims. CCC's argument that Count V falls within the policy's inverse condemnation exclusion fails.

### 5. __Count VII__

In Count VII, Harris states a negligence claim against Defendant Lucidi. Harris dismissed this claim. Because this claim is no longer part of Harris' third amended complaint and because neither Party fully addresses this claim in its brief, the Court shall not comment on it, and will treat this case as complete once the coverage issues regarding Harris' claims in Counts I through VI have been completely addressed.

In summary, the Court has found that Counts III, IV, and VI arise from inverse condemnation or eminent domain, and, as such, the Court **GRANT**S summary judgment in favor of CCC and declares that CCC need not defend the City against these three claims.

### C.  The CCC Policy's Damage Exclusion Provisions

CCC contends that aforementioned damage exclusion provisions exempt each *claim* from coverage.  Specifically, CCC asserts that Harris seeks damages for either "property damage" or or "emotional distress" in each of the remaining six counts[8] in the complaint and, as such, CCC should not be required to defend the City against them because these types of claims are excluded from the CCC policy.

Defendants retort that this Court should not grant summary judgment in favor of CCC because "material issues of fact" still exist regarding the interpretation of the term "property damage" as it is defined in the CCC policy.  Defendants' sole basis for this argument is that the City's two other insurers, the Westfield Group and Mid-American Fire & Casualty Company (the "Other Insurers"), with whom Defendants contracted to provide coverage for claims relating to "property damage," refuse.  The Other Insurances assert that the Harris' claims do not seek compensation for "property damage."   Defendants contend that the differing opinions of the Other Insurers vis-a-vis CCC creates a genuine issue of material fact precluding this Court from granting summary judgment in favor of Plaintiff.

Defendants' argument is not well taken for three reasons.  First, the Others Insurers policies define "property damage" differently than the CCC policy.  The Other Insurers define

---

[8]As noted above, Harris dismissed Count VII of his complaint and as such, the Court will only examine the first six counts for the remainder of this opinion.

"property damage" as "loss of use of tangible property" whereas the CCC policy defines it as "loss of use or reduction in value of tangible property." Second, the Other Insurers are self-interested and testify based only on their opinions of the language of their particular policies. Third, allowing an insured to create an issue of fact based solely on the conclusions of another insurer is anathema to the court's role in determining coverage issues. Defendants cite no precedent in support of their claim that the conclusion of a non-party insurer can create an issue of material fact about the coverage of another insurer's policy. It is well settled that "ordinarily, whether a given claim is covered under the terms of an insurance policy is a question of law." *Indiana Ins. Co. v. Midwest Maintenance, Inc.*, 174 F.Supp.2d 678, 681 (S.D. Ohio 2001) referencing *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166 (1982). Moreover, where a term is clearly defined, the Court will not give it a meaning other than the plain meaning which the contract provides. *See Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989). In this case, the CCC policy clearly defines "property damage" as, among other things, the "reduction in value of tangible property." Thus, to the extent that Harris' claims seek only to recover for the reduction in value of tangible property, the CCC policy does not require that CCC indemnify or defend the City with regard to that claim.

This, however, does not end the inquiry. Each claim must be examined individually to see if Harris seeks compensation for "property damage" as defined by the CCC policy. CCC does not examine each claim individually; rather, it states in a conclusory fashion that each claim seeks relief for property damage. CCC relies on two cases to support its position. In *Hartzell Ind., Inc. v. Federal Ins. Co.*, 168 F.Supp.2d 789 (S.D. Ohio 2001), the court held that a "loss of use of tangible property" occurs when property becomes less productive due to fans being turned

24

off thereby causing a decrease in worker productivity.  CCC in no way attempts to analogize *Hartzell* to the facts of this case, nor does the Court comprehend *Hartzell's* applicability to this case.  To the extent that CCC might be arguing that the turning-off of the fans in *Hartzell* is analogous to the alleged doctoring of Harris' water bills, the argument would fail because the water bills do not make up such a substantial portion of any of the six counts that *Hartzell* would be analogous.  In *Elizabethtown Water Co. v. Hartford Cas. Ins. Co.*, 998 F.Supp. 447, 454 (D.N.J. 1998), the court held that a developers claim that the city failed to supply water for new land developments constituted a claim for "loss of use of tangible property" because the developers could not sell homes on the land without water.  Again, CCC fails to explain how *Elizabethtown* is analogous to the present case.

Thus, the Court must examine each claim individually to determine whether Harris seeks damages for "loss of use" or "reduction in value" of "tangible property."  In Count I, Harris' tortious interference claim, Harris seeks damages for tortious interference with contractual rights or business relations with tenants or prospective purchasers of the Terrace Property and Interstate Property, respectively.  In this claim, Harris contends that the alleged actions of Defendants caused him to sell the Terrace Property at a loss of $220,000.  He also mentions that he suffered "severe emotional distress" as a result of Defendants actions.  He concludes by generally requesting damages in excess of $1,000,000.  If Harris had succeeded on the merits of the underlying case, this Court's decision would be much easier.  To the extent that the jury awarded Harris damages for emotional distress or for the reduction in value of the Terrace Property, the CCC policy would explicitly preclude CCC from indemnifying Defendants.  There

25

is no jury award, however, and this Court is left to contemplate what damages Harris is actually trying to achieve in Count I of his complaint.

CCC relies on *General Star Nat. Ins. Co. v. Palmer Township*, 2004 WL 1175729 (E.D. Pa. 2004), in support of its proposition that Harris' tortious interference claim is a claim for the reduction in value of property. In *General Star*, the court held that a claim against a city for tortious interference with contract fell within an insurance policy's exclusion "for damages to or destruction of any property, including diminution of value or loss of use." *Id.* at *5. The court only did so, however, "because the exclusion clearly and unambiguously refers to 'any property' and does not include any limiting terms such as 'tangible property.'" *Id.* In this case, the CCC policy's exclusion clearly applies only to tangible property. Contractual relations are not tangible property. Thus, *General Star* is inapposite to the facts of this case. *Elizabethtown* is likewise inapplicable. In *Elizabethtown*, the court found that the property had lost its use because the plaintiff could not form future contracts, i.e. no one would buy homes on his land. *Elizabethtown,* 998 F.Supp. at 454. In this case, Harris alleges interference with existing, not future contracts.

Based on the foregoing analysis, the Court concludes that the majority of damages Harris seeks in Count I of his complaint relate to the alleged damage to existing contracts. Since these contracts are not tangible property, the "property damage" exclusion in the CCC policy is inapplicable. Thus, CCC must defend the City against Count I of the Harris lawsuit.

In Count II, Harris' annexation claim, Harris seeks damages for the resulting loss of revenue relating a commercial lease he had on the Interstate Property, a court ordered de-annexing of the property or in the alternative compensation for the lost value of the Interstate

26

Property, and punitive damages.  To the extent that Harris seeks equitable relief through this claim, the CCC policy does not require it to defend the City.  To the extent that it seeks punitive damages, CCC is not required to pay the City's defense costs because Ohio public policy prohibits insurance coverage for malicious conduct.  *See State Farm Mut. Ins. Co. v. Blevins*, 49 Ohio St.3d 34, 38 (1990) ("Ohio law has long disfavored insurance against punitive damages resulting from the insured's own torts").  Moreover, the loss of revenue from the existing lease is best recoverable by way of the tortious interference claim in Count I.  Thus, the crux of the monetary damages Harris seeks in Count II results from the perceived loss of value to the Interstate Property.  As a result, the "property damage" exclusion of the CCC policy applies, and CCC does not have to pay the defense costs of the City as they relate to Count II.

Counts III and IV, the takings claims, seek reimbursement for the lost value of the property.  Thus, the "property damages" exclusion of the CCC policy applies, and CCC does not have to pay the defense costs of the City as they relate to Count III and Count IV.

In Count V, the civil conspiracy claim, Harris does not state the type or nature of the damages he requests.  A plaintiff is entitled  to "actual damages" if he is successful in a civil conspiracy action.  *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419. Considering the allegations in Count V and the complaint as a whole, the crux of Harris' argument is that Defendants illicit actions, conspiratorial and otherwise, caused the Terrace and Interstate Property to decrease in value.  Thus, the "property damages" exclusion of the CCC policy applies, and CCC does not have to pay the defense costs of the City as they relate to Count V.

27

As the Court analyzed above, the 42 U.S.C. §1983 claim that Harris makes in Count VI is akin to a takings claim. Hence, while Harris asserts that he is seeking general compensatory damages in an amount in excess of $1,000,000, the crux of the relief sought in Count VI must be the lost value of his property. As a result, the "property damages" exclusion of the CCC policy applies, and CCC does not have to pay the defense costs of the City as they relate to Count VI.

In summary, the Court has found that the "property damages" exemption in the policy applies to the allegations in Counts II, III, IV, V, and VI of Harris' complaint, and, accordingly, the Court **GRANTS** summary judgment in favor of CCC and declares that CCC need not defend the City against these five claims.

### D. Indemnity and Reimbursement

Judge Frost dismissed the Harris lawsuit. Consequently, Harris did not receive any damages. Thus, there are no damages for CCC to indemnify. Therefore, the Parties Cross-Motions for Summary Judgment, to the extent that they request this Court to declare what claims if any CCC must indemnify the City for, is rendered **MOOT**.

CCC is entitled to recoup the defense costs it has incurred while defending the City in the Harris lawsuit pursuant to a reservation of rights to the extent that this Court has held that they did not have an obligation to do so under the policy. *See United National Ins. Co. v. SST Fitness Corp*, 309 F.3d 914 (6th Cir. 2002).

This Court has held that CCC does not have a duty to Defend the City with respect to Counts II, III, IV, V, and VI of Harris' complaint. CCC is entitled to reimbursement with respect to the costs that they incurred in defending the City against those counts.

Count I does not fall within any of the exemptions CCC cites and the conduct described therein falls within the "wrongful actions" covered by the CCC policy.  Thus, CCC must pay the defense costs of the City as they relate to Count I and CCC is not entitled to any reimbursement for any costs they have already expended in defending the City against Count I of the Harris complaint.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **GRANTED in part**, **DENIED in part, and rendered Moot in part,** and Defendants' Motion for Summary Judgment is **GRANTED in part, DENIED in part, and rendered Moot in part**.  CCC must pay the defense costs related to Count I of the Harris claim but not Counts II, III, IV, V, or VI.[9]

This case is dismissed.

**IT IS SO ORDERED.**


    **s/Algenon L. Marbley**           
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**DATED:  March 8, 2007**

---

[9]As discussed previously, Count VII has been dismissed.